# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| The Cincinnati Insurance Company, an Ohio Corporation, | ) ) ) | |
| Plaintiff, | ) ) | **ORDER** |
| vs. | ) ) | |
| B & B Paving, Inc. d/b/a B & B Dirtworks, Michael Baumgartner, Nancy Baumgartner, | ) ) ) | Case No. 1-16-cv-340 |
| Defendants. | ) | |

Before the court is The Cincinnati Insurance Company's ("Cincinnati") "Motion for Summary Judgment," (Doc. No. 31), wherein Cincinnati seeks summary judgment as to its claims for breach of contract and *quia timet*. B & B Paving, Inc., Michael Baumgartner, and Nancy Baumgartner (collectively "the Defendants") have not responded to the motion.

## I.     BACKGROUND

Unless otherwise noted, the following facts are undisputed and straight-forward. As is represented to the court, Michael and Nancy Baumgartner own and operate B & B. B & B entered into two separate contracts for grading services at separate construction sites in North Dakota. These contracts required B & B to secure surety bonds (the "Surety Bonds"), which B & B obtained from Cincinnati. As a requirement for execution of these bonds, Cincinnati required B & B, with both Michael Baumgartner and Nancy Baumgartner as signatories, to sign corresponding indemnity contracts ("the Indemnity Agreements") which, generally speaking, required B & B to indemnify Cincinnati for any claims paid out under the bonds.

### A. Indemnity Agreements

As is relevant in the current motions, the two Indemnity Agreements track one another verbatim. In relevant part, the agreements provide that B & B agreed to:

> Indemnify the Surety and hold it harmless from and against any and all liability, losses, costs, damages, attorneys' fees, disbursements and expenses of whatever kind or nature which the Surety may sustain or incur by reason or in consequence of having executed or procured the execution of the Bond or Bonds aforementioned and/or which the Surety may sustain or incur in making any investigation, in settling any claims or in defending or prosecuting any actions, suits or other proceedings which may be made or brought under or in connection therewith, and/or in recovering or attempting to recover salvage or any unpaid Bond premium in obtaining or attempting to obtain release from liability, or in enforcing any of the covenants of this Agreement. The Undersigned will pay over, reimburse and make good to the Surety, its successors or assigns, all money which the Surety or its representative shall pay, or cause to be paid or become liable to pay, by reason of the execution of any such Bond or Bonds, such payment to be made to the Surety as soon as it shall become liable, whether the Surety shall have paid out such sum or any part thereof or not.

(Doc. Nos. 1-1, 1-2). The agreements contain prima facie evidence clauses providing:

> Surety shall have the right to handle or settle any claim or suit arising out of or related to either or both any Bond and/or this Agreement. An itemized statement of loss and expense incurred by the Surety, sworn to by an officer of the Surety shall be prima facie evidence of the facts and extent of the Undersigned's liability under this Agreement.

(Doc. Nos. 1-1, 1-2). The agreements conclude with severability clauses providing that the "partial or complete invalidity of any one or more provisions of this Agreement shall not effect the validity or continuing force and effect of any other provision." (Doc. Nos. 1-1, 1-2).

### B. Claims Under the Surety Bonds

Cincinnati received four claims under the bonds totaling $82,064.95. Cincinnati received one claim under the first surety bond in the amount of $25,992.87. (Doc. No. 33-1). Cincinnati received three claims under the second surety bond in the amounts of $12,172.80, $13,374.20, and

2

$30,525.08, for a total of $56,072.08. (Doc. No. 33-1). After hiring counsel to investigate the claims, Cincinnati paid these claims. (Doc. No. 33-1). Cincinnati sent a demand letter seeking indemnification under the Indemnity Agreements. (Doc. No. 1-3). Although acknowledging they received this letter, (Doc. No. 33-6), the Defendants did not remit payment. (Doc. Nos. 33-1; 33-6).

## II. DISCUSSION

The current motion for summary judgment focuses on Cincinnati's breach of contract claim. Cincinnati argues the undisputed facts demonstrate the Defendants breached their obligations under the Indemnity Agreements. As to damages, Cincinnati requests the court enter judgment in the amount of $96,050.65, which represents the $82,064.95 paid under the Surety Bonds and $13,985.70 for costs and expenses associated with discharging its obligations under the Surety Bonds and enforcing the Indemnity Agreements. The court and the parties are well-versed in the standard for summary judgment and the court will not repeat it here.

### A. Defendants' Failure to Respond

From the outset, the court notes that the Defendants have not responded to the current motion, and their time for doing so has lapsed. See D.N.D. Civ. L. R. 7.1(A)(1); Fed.R.Civ.P. 6(d). Under D.N.D. Civ. L. R. 7.1(F), a "party's failure to serve and file a memorandum or a response within the prescribed time may subject a motion to summary ruling. . . An adverse party's failure to serve and file a response to a motion may be deemed an admission that the motion is well taken." There is a question, however, about whether this court's local rule can bypass Fed.R.Civ.P. 56(a)'s requirement that the court make a determination that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Given this uncertainty, the court will make the required evaluation. In doing so, the court may engage in this inquiry based solely upon

the documents provided by the movant, with the local rules deeming the adverse party's failure to respond as forfeiting the right to have the court consider any argument the adverse party might proffer as to the inappropriateness of summary judgment.

By failing to respond to the instant motion, the local rules deems Cincinnati's motion to be well taken to the extent the court will gauge the merits of the motion solely on the information Cincinnati has proffered to the court. The Defendants' failure to respond, in effect, deprives them of their opportunity to be heard on the motion.

### B. Forum Selection and Choice of Law Clauses

As another preliminary matter, the court notes each of the Indemnity Agreements contain forum selection and choice of law clauses providing the agreements "shall be governed by the laws of the State of Ohio, with proper venue being Butler County." However, neither party has cited nor relied upon this provision, raising the issue of whether the parties waived their contractual right to have this provision apply. Staying true to the choice of law clauses, the court must look to applicable Ohio law, under which "[w]aiver of a contractual right can occur when a party intentionally acts in a manner inconsistent with claiming that right." Bldg. Servs. Inst. v. Kirk Williams Serv.s Co., L.L.C., No. 07AP-686, 2008 WL 747657 at *2 (Ohio Ct. App. 2008); see also Cromeans v. Morgan Keegan & Co., Inc., 303 F.R.D. 543 (W.D. Mo. 2014) (observing "[w]hen a party does not invoke the state law designated in a contractual choice of law provision, the party has waived it.").

Both parties thus far have intentionally acted in a manner inconsistent with their contractual right to have this action forumed in Butler County, Ohio and governed by Ohio law. By bringing this action in federal court in North Dakota, and by arguing it is entitled to summary judgment by invoking North Dakota law, the court concludes Cincinnati waived its contractual rights under this

4

clause. By continuing with this litigation in North Dakota without objection, and by defending itself in this action by invoking North Dakota law, the court likewise concludes the Defendants waived their contractual rights under this clause. Without direction to the contrary, this court will apply North Dakota law as it normally would sitting in diversity jurisdiction.

### C. The Defendants Breached the Indemnification Agreements

Cincinnati argues it is entitled to summary judgment because the Defendants undisputedly breached the Indemnity Agreements by not remitting payment for claims Cincinnati paid out under the Surety Bonds. It is undisputed that Cincinnati paid out claims made under the Surety Bonds. It is also undisputed that the Defendants have not compensated Cincinnati for those paid claims. The question is whether this failure to do so constituted a breach of the Indemnity Agreements.

With regard to indemnity contracts, the North Dakota Supreme Court has said:

> An indemnity is "a contract by which one engages to save another from a legal consequence of the conduct of one of the parties or of some other person." N.D.C.C. § 22–02–01. " 'Indemnification is a remedy which allows a party to recover reimbursement from another for the discharge of a liability which, as between them, should have been discharged by the other.' " Olander Contracting Co. v. Gail Wachter Inv., 2002 ND 65, ¶ 15, 643 N.W.2d 29 (quoting Mann v. Zabolotny, 2000 ND 160, ¶ 7, 615 N.W.2d 526). We have recognized that "indemnity is an equitable doctrine, which is not amenable to hard and fast rules." Mann, at ¶ 7.

Specialized Contracting, Inc. v. St. Paul Fire & Marine Ins. Co., 2012 ND 259, ¶ 14, 825 N.W.2d 872. In interpreting these contracts, the court has further said:

> Construction of a written contract to determine its legal effect is a question of law, which is fully reviewable on appeal. Hoge v. Burleigh Cnty. Water Mgmt. Dist., 311 N.W.2d 23, 27 (N.D.1981). An indemnity contract is interpreted applying the general rules for contract interpretation. Id. The indemnity provision should be interpreted to give effect to the parties' mutual intentions if it can be done consistently with legal principles. Id.; see also N.D.C.C. § 9–07–03. The parties' intent is to be ascertained from the writing alone if possible. Hoge, at 27; see also N.D.C.C. § 9–07–04. We consider the indemnity contract as a whole and give effect

5

to every part. N.D.C.C. § 9–07–06. "In determining whether or not the trial court erred as a matter of law in its construction of the contract we must be guided first by the language of the contract itself, and where the contract is clear and unambiguous there is no reason to go further." Hoge, at 27. We give words in a contract their plain, ordinary, and commonly understood meaning unless they are used by the parties in a technical sense or a special meaning is given to them by usage. N.D.C.C. § 9–07–09.

Id. at ¶ 13. In addition, N.D.C.C. § 22-02-07 provides that, unless a contrary intention appears, contracts of indemnity are subject to the following rules of interpretation:

> 1. Upon an indemnity against liability, expressly or in other equivalent terms, the person indemnified is entitled to recover upon becoming liable.
> 2. Upon an indemnity against claims, demands, damages, or costs, expressly or in other equivalent terms, the person indemnified is not entitled to recover without payment thereof.
> 3. An indemnity against claims, demands, or liability, expressly or in other equivalent terms, embraces the costs of defense against such claims, demands, or liability incurred in good faith and in the exercise of reasonable discretion.
> 4. The person indemnifying is bound, on the request of the person indemnified, to defend actions or proceedings brought against the latter in respect to the matters embraced by the indemnity, but the person indemnified has the right to conduct such defense if that person chooses to do so.
> 5. If, after request, the person indemnifying neglects to defend the person indemnified, a recovery against the latter, suffered by the latter in good faith, is conclusive in the latter's favor against the former.
> 6. If the person indemnifying, whether that person is a principal or a surety in the agreement, has not had reasonable notice of action or proceedings against the person indemnified or is not allowed to control its defense, judgment against the latter is only presumptive evidence against the former.
> 7. A stipulation that a judgment against the person indemnified shall be conclusive upon the person indemnifying is inapplicable if the person indemnifying had a good defense upon the merits which, by want of ordinary care, the person indemnifying failed to establish in the action.

Where any ambiguity exists in an indemnity contract, that ambiguity is to be construed against the party receiving the indemnity. Specialized Contracting, at ¶ 15.

With these principles of construction in mind, the court concludes the Indemnity Agreements are unambiguous. The Indemnity Agreements required the Defendants to indemnify Cincinnati "and

6

hold it harmless from and against any and all liability, losses, costs, damages, attorneys' fees, disbursements and expenses of whatever kind or nature which the Surety may sustain or incur by reason or in consequence of having executed or procured the execution of the" Surety Bonds. (Doc. Nos. 1-1, 1-2). This required the Defendants to "pay over, reimburse and make good to the Surety, its successors or assigns, all money which the Surety or its representative shall pay, or cause to be paid or become liable to pay, by reason of the execution of any such Bond or Bonds, <u>such payment to be made to the Surety as soon as it shall become liable</u>, whether the Surety shall have paid out such sum or any part thereof or not." (Doc. Nos. 1-1, 1-2) (emphasis added); <u>accord</u> N.D.C.C. § 22-02-07(1) (providing that "the person indemnified is entitled to recover upon becoming liable."). In effectuating that end, the Indemnity Agreements set forth the procedure by which the parties were to abide if a claim was made against the Surety Bonds. Once Cincinnati received a claim under the Surety Bonds, the Indemnity Agreements required the Defendants, upon receipt of a demand, to deposit cash or other agreed upon collateral with Cincinnati. Cincinnati could then use such funds or collateral to fulfill its obligations under the Surety Bonds. Under the contract, the demand was sufficient if Cincinnati sent the demand via registered mail to either the address set forth in the Indemnity Agreements or the Defendants' address last known by Cincinnati.

Here, Cincinnati provided notice via a demand letter dated July 18, 2016, (Doc. No. 33-4), receipt of which the Defendants acknowledge.[1] (Doc. No. 33-6). The Defendants also admit they did not reimburse Cincinnati for those claims paid under the Surety Bonds, nor did they reimburse

---

[1]Although the Indemnity Agreements required Cincinnati to send this demand via registered mail, there is no indication, whether in the demand letter or the affidavit of Cincinnati's representative, indicating Cincinnati complied with this contractual requirement. However, because the Defendants acknowledged receipt of the letter, the Defendants do not take exception with the method of service, and this requirement does not appear to be a condition precedent to other obligations under the Indemnity Agreements, the court will not address the issue further.

7

Cincinnati for the costs associated with investigating and handling those claims. (Doc. No. 33-6). This undisputed failure constituted a breach of the unambiguous terms of the Indemnity Agreements, entitling Cincinnati to summary judgment on its breach of contract claim.

### D. Amount of Damages

With this conclusion, the court must next determine the amount of damages warranted by the breach of contract claim. In an affidavit sworn by Cincinnati's Superintendent of Bond Claims, the affiant attests Cincinnati paid out $82,064.95 for the claims made under the Surety Bonds. (Doc. No. 33-1). In the affidavit, the affiant also attests Cincinnati has incurred an additional $11,315.70 in costs and expenses in discharging its obligations under the Surety Bonds and enforcing the Indemnity Agreements. In addition, Cincinnati represents that it has or will incur in excess of $2,670 in attorneys' fees related to the current motion. In aggregate, Cincinnati asks the court to enter judgment against the Defendants, jointly and severally, in the amount of $96.050.65.[2]

*1. Prima Facie Evidence Clause*

In arguing for the propriety of this award, Cincinnati relies on the prima facie evidence clauses found in the Indemnity Agreements. These clauses provide that an "itemized statement of loss and expense incurred by the Surety, sworn to by an officer of the Surety[,] shall be prima facie evidence of the facts and extent of the Undersigned's liability under this Agreement." (Doc. Nos. 1-1, 1-2). The Eighth Circuit has, without objection, applied prima facie evidence clauses in indemnity agreements involving attorneys' fees. Spritas Co. v. Ins. Co. of State of Pa., 555 F.3d 647,

---

[2]The Indemnity Agreements provide the "Undersigned Principal and Indemnitor(s) . . . Hereby Jointly and Severally Covenant and Agree" to the conditions set forth in the Indemnity Agreements. (Doc. Nos. 1-1, 1-2). As noted above, all three Defendants signed both Indemnity Agreements, rendering them jointly and severally liable for any monies owed under the terms of the Indemnity Agreements.

8

656 (8th Cir. 2009). In describing this clause, the circuit said:

> Regarding the burden of proof, the indemnity agreements in the present case explicitly set forth a method for proving attorney fees. The agreements contain a burden shifting framework that permitted ICSP to use an itemized sworn statement from an officer of the company as prima facie evidence of its fees. Having submitted such a statement (and having supported that statement with additional documentation regarding the fees), the burden shifted to Appellants to rebut the prima facie showing.

Id. at 654. This provision "clearly placed the burden on Appellants to disprove ICSP's prima facie showing as to fees." Id. at 656; see also Safeco Ins. Co. v. Richard Knutson, Inc., Civl No. 08-5928, 2010 WL 2104542 (D.Minn. May 25, 2010) (applying a prima facie evidence clause). Like the clause considered in Spritas, the primae facie evidence clauses in the Indemnity Agreements shifted the burden of disproof onto the Defendants upon submission of proper documents by Cincinnati.

### 2. Claim Amounts

The affidavit submitted by Cincinnati's representative details the claims Cincinnati paid out under the Surety Bonds. Specifically, the affidavit sets forth the specific bond under which the claim was made, the given project under which the claim arose, the claimant, and the amount paid. (Doc. No. 33-1 p. 4). The specificity of the affidavit qualified as an "itemized statement of loss and expense incurred by the Surety" within the plain meaning of the prima facie evidence clauses. Pursuant to these clauses, this shifted the burden onto the Defendants to disprove the amounts paid for such claims. The Defendants have not made any serious attempt to refute the total, falling well short of carrying their burden under the Indemnity Agreements. Accordingly, Cincinnati is entitled to an award of $82,064.95, which represents the claim amounts paid under the Surety Bonds.

### 3. Cincinnati is not Entitled to the Remaining Expenses at This Time

Cincinnati makes two additional claims for expenses under the Indemnity Agreements. First,

9

Cincinnati seeks $11,315.70 in costs and expenses associated with discharging its obligations under the Surety Bonds and enforcing the Indemnity Agreements. Cincinnati also represents it has or will incur in excess of $2,670 in attorneys' fees associated with this motion. In sum, Cincinnati seeks $13,985.70. The court is not inclined to award any of this amount at this time for two reasons.

First, the affidavit submitted by Cincinnati's Superintendent of Bond claims does not satisfy the prima facie evidence clause. With regard to the sought $11,315.70, Cincinnati does not break down how it incurred these expenses, instead opting to present the expenses in a lump sum fashion. How Cincinnati went about presenting its claim for these expenses is inapposite from how it presented its statement of loss and expenses regarding the amounts paid out under the Surety Bonds. Cincinnati's summary aggregation can hardly said to be "itemized" within the plain meaning of the prima facie evidence clause. This lack of itemization segues into the second, and more concerning, problem facing Cincinnati's request for these amounts.

Cincinnati bases its request for these amounts on those provisions of the Indemnity Agreements generally requiring the Defendants to pay for Cincinnati's costs and expenses in performing under the Surety Bonds and the Indemnity Agreement, including attorneys' fees. In North Dakota, attorneys' fees are generally available to a prevailing party only when specifically allowed for by contract. N.D.C.C. § 28-26-01(1). A contractual allowance for collection of attorneys' fees notwithstanding, such provisions in debt instruments are generally void:

> Any provision contained in any note, bond, mortgage, security agreement, or other evidence of debt for the payment of an attorneys' fee in case of default in payment or in proceedings had to collect such note, bond, or evidence of debt, or to foreclose such mortgage or security agreement, is against public policy and void.

N.D.C.C. § 28-26-04; <u>Farmers Union Oil Co. of New England v. Maixner</u>, 376 N.W.2d 43, 48 (N.D.

10

1985) (stating, although "attorneys' fees can be awarded if agreed by the parties, either expressly or impliedly, such an agreement is limited by Section 28-26-04.").

The North Dakota Supreme Court has generally upheld attorneys' fees provisions in indemnity contracts unrelated to any debt instrument. See e.g., Minex Res., Inc. v. Morland, 518 N.W.2d 682, 689 (N.D. 1994). The same cannot be said, however, where the indemnity contract is executed as a part of, or related to, the debt instruments set forth at N.D.C.C. § 28-26-04. See Maixner, 376 N.W.2d at 48 (stating N.D.C.C. § 28-26-04 "includes the personal guarantee agreement at issue in this case because the guarantee relates to the payment of debt.") (emphasis added). In keeping with that principle, the North Dakota Supreme Court has applied N.D.C.C. § 28-26-04 to invalidate attorneys' fees provisions in indemnifications agreements executed as a requirement for issuance of a construction bond. Hartford Acc. & Indem. Co. v. Anderson, 155 N.W.2d 728, 735-36 (N.D. 1968) (concluding "our study of this case has disclosed that the judgment includes attorney fees, and this is perhaps because the indemnity agreement so provides. It is our view, however, that the legislature intended, under N.D.C.C. Sec. 28-26-04, to prohibit a provision for the payment of attorney fees in an instrument such as that involved in this case.").

Whether Cincinnati can collect the requested amounts is questionable. In light of N.D.C.C. § 28-26-04 and Hartford, the Indemnity Agreements are likely void to the extent they seek reimbursement for attorneys' fees incurred from Cincinnati's initial collection efforts through the present posture of this case. Whether N.D.C.C. § 28-26-04 might also preclude Cincinnati's collection of attorney's fees incurred prior to its collection efforts, including investigating the claims made under the Surety Bonds, is also debatable. Taken with the lack of itemization in the supporting affidavit, the court cannot discern what portion of the additionally requested $13,985.70 is

11

collectable under North Dakota law. Cincinnati has not shown it is entitled to the requested additional sum of $13,985.70 at this time.

## III. CONCLUSION

Based on the foregoing, the court **GRANTS IN PART AND DENIES IN PART** Cincinnati's Motion for Summary Judgment (Doc. No. 31) as follows:

1. **GRANTS** Cincinnati's request for summary judgment as to its breach of contract claim against the Defendants.

2. **GRANTS** Cincinnati's request for $82,064.95, which represents the principal amounts paid under the Surety Bonds. Further proceedings may be necessary to determine the exact amount owed for purposes of entry of final judgment after adding potentially applicable accrued interest.

3. **DENIES**, without prejudice, Cincinnati's request for the additional $13,985.70. Cincinnati may submit a supplemental affidavit detailing the requested amounts in more particularity. If Cincinnati still seeks attorneys' fees, it should file supplemental briefing with the court on why such fees are allowable under N.D.C.C. § 28-26-04.

**IT IS SO ORDERED.**

Dated this 25th day of September, 2017.

> */s/ Charles S. Miller, Jr.*
> Charles S. Miller, Jr., Magistrate Judge
> United States District Court